**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No._____

JOHN PAUL ANDERSON,
as Receiver for Mantria Corporation,

               Plaintiff,

v.

ASTOR WEISS KAPLAN & MANDEL, LLP;
TATUM, LLC, a division of Randstad Holding, nv;
CHRISTOPHER P. FLANNERY, an individual;
DANIEL J. RINK, an individual;
KRASSENSTEIN & UNGER, LLC; and
STEVEN L. GRANOFF, an individual.

               Defendants.

---

## COMPLAINT AND JURY DEMAND

Plaintiff John Paul Anderson, as Receiver for Mantria Corporation and its related Mantria Companies ("Mantria"), through his counsel, Brownstein Hyatt Farber Schreck, LLP, states the following for his Complaint against Defendants Astor Weiss Kaplan & Mandel, LLP; Tatum, LLC, a division of SFN Group, Inc.; Christopher P. Flannery; Daniel J. Rink; Krassenstein & Unger, LLC; and Steven L. Granoff ("Defendants"):

## **INTRODUCTION**

1.      Plaintiff John Paul Anderson brings this lawsuit in his capacity as Receiver for Mantria to recover over $39 million in losses suffered as a result of damages entered against it in the action captioned *Securities and Exchange Commission v. Mantria Corporation et. al*., Civ.

Action No. 09-cv-02676 CMA MJW, United States District Court, District of Colorado (the "SEC Action").

2.      The Receiver asserts claims against Mantria's attorneys, accountants, and advisors for negligence, malpractice, breach of fiduciary duty, breach of contract, aiding and abetting a breach of a fiduciary duty, and unjust enrichment based on, *inter alia*:  their approval of false and misleading Private Placement Memoranda, offering documents, and sales materials presented to investors; their failure to adequately supervise Mantria's securities sales, representations, and operations; their failure to implement appropriate accounting practices and controls; and their failure to ensure compliance with federal securities regulations.

## THE PARTIES

3.      Plaintiff John Paul Anderson was appointed Receiver of Mantria Corporation and its related companies (the "Receivership Defendants") by The Honorable Christine M. Arguello ("the Court") on April 30, 2010.  A true and correct copy of the Receivership Order is attached as Exhibit A ("Ex. A").   Concurrently with the Receivership Order, the Court froze the Receivership Assets and the Recoverable Assets (as defined by the Receivership Order).  (Ex. A, ¶ 3.)  As Receiver, Mr. Anderson is charged to oversee the recovery of the Receivership Assets for distribution to Mantria's investors, employees, and creditors.  Mr. Anderson also is charged with, among other things, the prosecution of any claims the Receivership Defendants have against others for the recovery of Receivership Assets.  (*See* Ex. A, at ¶ 31.)  The Receiver brings this action as part of his duty to "to pursue and preserve" the claims of the Receivership Defendants.  (Ex. A, ¶ 5.)

4.      Astor Weiss Kaplan & Mandel, LLP ("Astor Weiss") was Mantria's outside counsel.  Astor Weiss provided legal services, including securities advice, to Mantria during the relevant time period.  Astor Weiss also controlled and managed trust funds through which investor funds were funneled to Mantria.  At all relevant times, Astor Weiss acted through its shareholders, agents, and employees, including, but not limited to, David Mandel, Christopher Flannery, and Irene Singer.

5.      Christopher P. Flannery ("Flannery") is a Philadelphia-based attorney.  During most of the relevant time period, Flannery was an associate of Astor Weiss, served as legal counsel to Mantria, and later became General Counsel of Mantria.

6.      Collectively, Flannery and Astor Weiss are referred to herein as the "Attorney Defendants."

7.      Tatum, LLC ("Tatum") is headquartered in Atlanta and provides executive services nationwide with a focus on the office of the chief financial officer ("CFO").  Tatum provided financial and consulting services to Mantria during the relevant time period.  At all relevant times, Tatum acted through its partners, principals, and employees, including, but not limited to, Daniel Rink, Steve Markert, and Elizabeth Shuttleworth.

8.      Daniel J. Rink ("Rink") is an individual who served as Mantria's Chief Financial Officer and also as a partner of Tatum during the relevant time period.  Rink is a licensed and practicing attorney, a licensed CPA, and is currently Co-General Counsel of Stream TV Networks, Inc.  Prior to his position at Mantria, Rink held several director-level, Vice President, and CFO positions spanning over thirty years at domestic and international companies.

9.      Krassenstein & Unger, LLC ("Krassenstein"), formerly known as Krassenstein, Granoff & Unger, LLC, is a Philadelphia-based accounting firm that served as Mantria's outside auditor and accountant during the relevant time period.  At all relevant times, Krassenstein acted through its partners and employees, including, but not limited to, Steven Granoff.

10.     Steven L. Granoff ("Granoff") is an individual who served as Mantria's outside auditor, Director of Accounting, and Controller during the relevant time period, as well as a partner at Krassenstein.  Granoff is a licensed CPA who had over forty years of accounting experience at the time he joined Mantria.

11.     Collectively, Tatum, Rink, Krassenstein and Granoff are referred to herein as the "Accounting Defendants."

## JURISDICTION AND VENUE

12.     Pursuant to 15 U.S.C. §§ 77v(a) and 78aa, federal courts have jurisdiction over all suits in equity and actions at law brought to enforce any liability or duty created by federal securities law.

13.     This Court has ancillary jurisdiction over this action as it is an action instituted by the Receiver to execute his duties as set forth in the Receivership Order, and this action seeks to accomplish the ends sought by the SEC Action in which Mr. Anderson was appointed as Receiver.

14.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) as it is so related to the claims asserted in the SEC Action that it forms part of the same case and controversy.

15.     This Court also has jurisdiction over this action because it involves "Recoverable Assets," over which the Court took exclusive jurisdiction pursuant to the Receivership Order. (*See* Ex. A, ¶ 1.)

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this action is ancillary to the SEC Action pending in this District, the Receiver was appointed in this District, and this action involves "Recoverable Assets," over which the Court took exclusive jurisdiction pursuant to the Receivership Order.  (*See* Ex. A, ¶ 1.)

17.     Further, Mantria transacted business in Colorado, and the Defendants performed their services for Mantria understanding that Mantria's capital would be derived primarily from Colorado-based investors.

## STATEMENT OF FACTS

### *The Defendants' Advisory Roles at Mantria*

18.     Mantria was headquartered in Philadelphia, Pennsylvania and founded in 2005 by Troy Wragg.  In November 2009, the Securities and Exchange Commission (the "SEC") initiated civil charges against Mantria and other related parties alleging that they engaged in securities violations in connection with their efforts to obtain investors ("SEC Action").  Mantria is now in receivership under the Receivership Order.

19.     During the time that it was operating, Mantria's stated purpose was to develop housing and green technology primarily in rural Tennessee.  Over the years, Mantria created approximately 11 operating divisions and 36 wholly-owned or affiliated companies (the "Mantria Companies").  Through those companies, Mantria engaged in diverse operations including, but not limited to, mortgage banking, record production, and the production and sale of "biochar" – a

charcoal substitute made from organic waste.   Mantria raised capital through unregistered securities offerings that ultimately gave rise to the SEC Action.

20.     As Mantria grew, its workforce grew to over 60 employees.   Mantria also hired professionals, including accountants and lawyers, for assistance and guidance.   These professionals include the Defendants in this case.

21.     Mantria's organizational structure included multiple committees and teams staffed by over a dozen different senior Mantria personnel.   These committees included, among others, a Board of Directors, several Executive Committees, an Operations Committee, a "Doc Audit" Team, and a "Deal Team."  Of the various individuals who served on these committees, two were named in the SEC Action, Troy Wragg and Amanda Knorr. [1]

22.     Through this structure and by virtue of the number of personnel staffed at various levels in the company, Mantria had layers of controls designed to prevent power or control over the entire operation of the company from accumulating in the hands of one person.

Krassenstein

23.     In approximately 2006, Mantria hired Krassenstein for its auditing and accounting services.

24.     Among other things, Krassenstein was hired to:   (1) periodically review the internal controls of Mantria and make suggestions as necessary to keep Mantria in compliance with all federal and state regulations; (2) examine Mantria's accounting systems and make any changes therein that it deemed necessary to prepare financial statements; (3) provide Mantria with internally prepared consolidated compiled financial statements; (4) prepare balance sheets,

---

[1] Collectively, Troy Wragg and Amanda Knorr are referred to herein as the "SEC Defendants."

statements of income, retained earnings, and cash flows; (5) inform management of irregularities or illegal acts that came to its attention; (6) prepare all federal, state, and local income tax returns for Mantria; (7) periodically meet with Mantria's management and review the statements of operations; and (8) review Mantria's payroll taxes and 1099s for accuracy and compliance with existing laws.

25.     All told, Mantria paid Krassenstein over $11,000.00 for its accounting services during the relevant time period.

<u>Tatum and Rink</u>

26.     In 2007, after determining that Mantria needed to bolster Krassenstein's work with an in-house accounting expert and CFO, Mantria hired Tatum for a chief financial officer search and consulting services.  As a result of Tatum's consulting work, Mantria brought in Rink – a Tatum partner – as its CFO.

27.     During his tenure at Mantria, Rink, among other things, was responsible for budgeting, outside payroll processing, cash management, documentation, internal controls, financial planning and analysis, and any required SEC-related reporting.  As of July, 2007, Rink served on Mantria's Operations Committee and Executive Committee, which ran Mantria on a daily basis and had access to all Mantria-related documentation.

28.     Additionally, as a member of the Operations Committee and the Executive Committee, Rink had full, unrestricted access to what was known as "Mantria Central," which was a database of all of Mantria's electronic files, including financial information, information related to the securities offerings, information presented to investors, and information related to Mantria's investments.

29.     Although Rink and the other Tatum employees maintained their offices at Mantria's headquarters and bore a Mantria title, Mantria paid Tatum a fee for Rink's services, while paying Rink his salary directly.

30.     All told, Mantria paid Tatum over $300,000.00 for its executive CFO services during the relevant time period and paid Rink in excess of $300,000 wages.

<u>Astor Weiss and Flannery</u>

31.     During this same time, in August, 2007, Mantria began to look for securities counsel as part of its plan to raise investor capital.  As a result of this effort, Mantria engaged the Attorney Defendants – Astor Weiss and Flannery.

32.     The Attorney Defendants were charged with providing securities and corporate legal advice and related advice to Mantria.  All of Mantria's securities offerings (discussed in more detail below) were reviewed, prepared, and approved by the Attorney Defendants, and most, if not all, of the closings went through Astor Weiss.  Furthermore, Astor Weiss was charged with a "legal audit" of Mantria to review Mantria's corporate structure.

33.     Finally, as one of its first tasks, Astor Weiss was charged with attempting to register Wayde McKelvy as a broker-dealer.

34.     As part of its role in reviewing and approving the offerings, Astor Weiss was identified as Mantria's legal counsel on the offering documents, which stated that Astor Weiss acted as "special securities counsel" to the Company in connection with the offerings.  In this role, it was the Attorney Defendants, not the SEC Defendants, who had final approval authority over the documents that were provided to the investors.

35.     Although Flannery left Astor Weiss during the summer of 2009 to work in-house for Mantria, most of the Private Placement Memorandums were issued through Astor Weiss, while Flannery was employed with Astor Weiss.

36.     As with Rink, Flannery participated in each of the Operations Committee's disclosure discussions prior to the issuance of the securities offerings.

37.     Additionally, as with Rink, Flannery served on Mantria's Operations Committee and had full, unrestricted access to "Mantria Central," both while he was employed by Astor Weiss and when he joined Mantria as in-house counsel.

38.     All told, Mantria paid Astor Weiss over $200,000.00 for its legal services during the relevant time period.

<u>Granoff</u>

39.     In May, 2008, Mantria hired Granoff from Krassenstein to work for Mantria in-house, first as its Director of Accounting and then as its Controller.

40.     Granoff was responsible for all accounting-related matters, including performing financial accounting and preparing financial statements, budget reports, forecasting, profit and loss statements, recommendations for spending, and SEC-related reporting.

41.     Granoff reported to and worked along side of Rink, and together they were responsible for ensuring that Mantria's financials were properly and accurately prepared and that all aspects of the company's finances were properly documented.

42.     Additionally, Granoff was tasked with implementing updated and more sophisticated accounting software to replace Mantria's apparent use of the QuickBooks system.

*The SEC Action*

43.     With the professional counseling and guidance from Defendants, beginning in 2007, Mantria, primarily through its principals Troy Wragg and Amanda Knorr, began raising money using unregistered securities offerings or Private Placement Memorandums that were promoted and sold to investors.

44.     Mantria offered its "investment opportunities" primarily through Speed of Wealth, LLC ("SOW"), a Receivership Defendant, and its principals Wayde and Donna McKelvy.[2]   In addition, a significant portion of the investment proceeds were paid directly to Mantria by the investors through Astor Weiss's trust account.   The SEC Defendants and SOW Principals encouraged investors at the so-called investor "boot camps" to liquidate all of their traditional investments in order to purchase short-term Mantria securities that purportedly would pay high rates of return ranging from 17% to "hundreds of percents" annually.

45.     Wayde McKelvy was paid a 12.5% commission, or "finders fee," for each investor who agreed to participate in the offerings

46.     In encouraging investors to purchase Mantria securities at the boot camps and otherwise, the SEC Defendants and SOW Principals misrepresented the status and success of Mantria's business and the commission the SOW Principals received for selling Mantria securities.

47.     The SEC Defendants, as well as the named Defendants in this action, also withheld from investors, as well as many personnel within the corporation, that a substantial portion of the investor funds from its offerings were used to pay returns of existing investors.

---

[2] Collectively, Wayde and Donna McKelvy are referred to herein as the "SOW Principals."

48.     Any money and/or assets actually received by Mantria, and not used to pay returns to existing investors, was subsequently looted and misappropriated by the SEC Defendants and others within Mantria Corporation, including the named Defendants in this action.

49.     For example, Troy Wagg would often withdraw large sums of the money directly from the company for his personal use. On one occasion, he withdrew $125,000 from the company to take 20 of his friends to Las Vegas.

50.     All told, during the relevant time period, Mantria raised over $30 million from more than 300 investors in approximately 12 unregistered securities offerings to investors, with a face value totaling at least $122 million.

51.     The majority of the money the company received was not for the company's benefit as it was misappropriated by the SEC Defendants and others, including the named Defendants in this action. And, any slight benefit Mantria may have received as a result of the operation was illusory, as the purported benefit was meant to conceal benefits solely intended for the bad actors to the operation. This is best exemplified by the fact that, at the end of the day, Mantria had no real equity even after receiving over $30 million dollars from investors.

52.     In November 2009, the SEC sued Mantria, Mantria Principals, and SOW Principals in the SEC Action, alleging that Mantria's operations had generated no cash and that Mantria's claims of high rates of return to prospective investors were bogus.

53.     On August 5, 2011, the Court granted the SEC's Motion for Summary Judgment against Mantria Corporation in the SEC Action, and found that the Mantria and SOW Principals made material misrepresentations in connection with offers and sales of Mantria's securities,

including, among other things, representing that:  (1) Mantria generated millions of dollars in profits when in fact Mantria generated no profits; (2) Mantria built the world's first biorefinery plant in New Mexico when, in fact, Mantria never built or operated such a facility; (3) Mantria's biochar manufacturing facility was producing $6.2 million annually when, in fact, it never generated revenue; and (4) Mantria paid investors through profitable ventures when, in fact, it paid investor returns using other investors' money.

54.     Additionally, in connection with the offers, sales, and purchases of Mantria's securities, the Court found that the SOW and the SEC Defendants failed to disclose that Wayde McKelvy earned a 12.5% commission from each Mantria offering in violation of the securities laws, which ultimately totaled over $6.2 million in commissions.

55.     Further, the Court found that the securities offered and sold were not registered with the SEC, and Mantria was not affiliated with any broker dealer registered with the SEC, contrary to the securities laws.

56.     On September 12, 2011, a Final Judgment in the SEC Action was entered by the Court as to Mantria Corporation, which ordered, among other things, Mantria to pay $39,973,671.36 in restitution and penalties due to its securities violations.

57.     The securities violations and the resulting damage caused to Mantria – namely, the $39,973,671.36 in restitution ordered – were proximately caused by the gross breaches of duty of care on the part of the Accounting Defendants and the Attorney Defendants.

58.     Despite the greed-driven fraud perpetrated by select individuals at Mantria over time, and upon information and belief, Mantria began as a legitimate corporation.  Indeed,

Mantria was honored for its "Green" initiatives by former President Clinton and Secretary of State Hilary Clinton at the 5th Annual Meeting of the Clinton Global Initiative in 2009.

59.     For that reason, during the relevant time period, while the fraudulent scheme was carried out by select members of Mantria, there were individuals at various levels within Mantria who were unaware of the fraud, and had they known about it, they would have stopped the conduct and would have had authority to do so.

60.     Upon information and belief, these people include, but are not limited to, people in the position of Chief Human Resources Officer, the Chief Business Development Officer, the Chief Sales and Marketing Officer, as well as members of the Corporate Doc Audit Committee, the Corporation Deal Team, and the Corporation Green Team.

*The Attorney Defendants' Failure to Counsel Mantria Properly*

61.     First, the Attorney Defendants owed a fiduciary duty to Mantria as its principal legal counsel and legal advisor with respect to Mantria's securities offerings, which they breached.

62.     Among other things, Astor Weiss, through Flannery, counseled Mantria regarding regulatory compliance and prepared and reviewed the offerings, and they knew or should have known of the securities violations, improper representations and omissions, and risks they imposed on their client.

63.     In particular, in its role as "special securities counsel" to Mantria, Astor Weiss, through Flannery, prepared, reviewed, edited, and had final approval authority over the Private Placement Memorandums, which the Court found contained improper and incomplete disclosures.

64.    For example, Flannery knew that Mantria's biochar facility never went into full production and was only in the testing phase.  Despite this knowledge, he approved a Mantria securities offering dated August 31, 2009, that predicted returns of 450% for investors and estimated annual profits from, among other things, Mantria's purported biochar production systems in 2010 and 2011.

65.    Astor Weiss, through Flannery, also reviewed, edited, and had final approval authority over the PowerPoint presentations and other information that was provided to the investors, which contained, among other things, the claims of high rates of return and that were found to be misleading.

66.    Astor Weiss, through Flannery, also either advised Mantria or negligently failed to advise Mantria that it was selling unregistered securities in violation of the securities laws.

67.    Astor Weiss, through Flannery, also expressly advised Mantria that the securities did not need to be registered and that Mantria did not need to disclose SOW's 12.5% commission rate.  Instead, Flannery improperly advised Mantria that its disclosure of the "Estimated Sources and Uses of Funds" in the Private Placement Memoranda, which disclosed at least 5% in "sales fees" and noted that those fees may be negotiated at a commission greater than 5% in Mantria's "sole discretion," was a sufficient disclosure of Wayde McKelvy's commission rate.

68.    Moreover, Astor Weiss was independently aware of the commissions being paid to Wayde McKelvy.  For the earlier securities offerings, Astor Weiss was responsible for issuing the checks for the finders' fees in connection with each of the closings, including the checks that were issued to Wayde McKelvy.

69.     Thus, in reviewing the securities offerings and providing legal advice to Mantria, Flannery and Astor Weiss negligently advised Mantria and willfully ignored the numerous indications that Mantria was violating securities laws.   Despite this, Astor Weiss allowed approximately $20 million in investor funds to flow through its trust account to Mantria.

70.     Furthermore, the Attorney Defendants failed to properly monitor the activity in the trust accounts, commingled funds, failed to keep complete investor account records, and failed to appropriately account for the funds.

71.     Additionally, investors who made direct deposits to Mantria wrote their checks to Astor Weiss' trust account.

72.     In fact, Astor Weiss never created a separate trust account for the Mantria funds; rather, all of the investor payments flowed through Astor Weiss's general trust account.   As a result, Astor Weiss had numerous discrepancies in its maintenance of the trust account, which resulted in, among other things, Mantria's receipt of funds belonging to another Astor Weiss client on at least one occasion.

73.     Furthermore, Astor Weiss never took any action to determine that withdrawals from the trust account were for lawful purposes as articulated in the offerings.

74.     Mantria's securities violations, and the resulting SEC Action and Judgment, were proximately caused by the Attorney Defendants' breach of their duty of care and either their sanction of, or reckless disregard of, evidence of improper or faulty securities disclosures, improper claims in the offering documents and other investor material, and the other securities violations for which Mantria now has a $39 million judgment entered against it.

*The Accounting Defendants' Failure to Implement and Maintain*
*Appropriate Accounting Practices and Supervise the Offering Documents*

75.      Second, the Accounting Defendants failed to appropriately advise Mantria on the offering documents, and also failed to implement prudent accounting practices, make appropriate accounting projections, and ensure accurate financial reporting, budgets, investor disclosures, and related materials that grossly increased Mantria's risk and contributed to the false statements Mantria made in connection with its securities sales.

76.      Upon information and belief, and based on the Receiver's review of Mantria's financial records to date, from at least September 2007 until the initiation of the SEC Action, despite their obligations to the contrary, the Accounting Defendants failed to perform basic accounting functions.

77.      Among other things, the Accounting Defendants (1) did not regularly generate financial statements for any of the Mantria Companies; (2) did not regularly reconcile any of the bank accounts; (3) did not regularly generate operating budgets; (4) did not regularly generate forecasts or projections; (5) did not regularly close Mantria's books; (6) had no formalized process for how forecasts and projections, if they were created, were reviewed; (7) had no internal controls to accurately and reliably track the sources and uses of investor funds once they were deposited in the various bank accounts for the respective offering vehicle; (8) did not put in place adequate insurance policies; (9) allowed Mantria's insurance policies to lapse; and (10) failed to ever integrate the upgraded Infor accounting system into Mantria.

78.      As evidence of these failures, in 2009, when the SEC Action was filed, the Defendants were required to produce basic financial information to the SEC.  When it was produced, the information was cobbled together in unsophisticated spreadsheets that contained

significant gaps.  The Receiver was required to undertake a significant forensic accounting to attempt to reconstruct the financial activity of the Receivership Defendants.

79.     Additionally, the Accounting Defendants failed to implement the accounting software that Mantria purchased specifically to establish better internal controls, even though they were tasked to do so.

80.     In particular, at the time Granoff went in-house, Mantria was using QuickBooks, which is unsophisticated software, particularly for larger businesses with multiple divisions and operating entities, and has internal control weaknesses.

81.     Recognizing that it needed to move away from QuickBooks, Mantria acquired accounting software called "Infor," paying over $400,000.00 for the software, licenses, hardware, and installation labor.

82.     Despite these obligations and significant expenditures, the Accounting Defendants *never* bothered to implement the Infor software.

83.     Additionally, the Accounting Defendants failed to ensure that Mantria was making proper disclosures to investors, and negligently supervised the offering materials.

84.     Among other things, Rink was a member of Mantria's Operations Committee, which discussed, prior to the offerings, the disclosures that needed to be included in the Memorandums.  Rink advised and weighed in on all of the disclosures made by Mantria as part of its offerings.

85.     To that end, Tatum, through Rink, expressly approved the disclosures and lack thereof related to Wayde McKelvy's 12.5% commission.  Rink was aware of the commission:  as part of his duties, Rink reviewed and approved weekly check request forms that identified

McKelvy's commissions, which totaled over $6.2 million.  Yet, Rink never ensured that Mantria disclosed the commission or stopped paying it.

86.     Rink also knew that Mantria had not sold any biochar or had any biochar manufacturing systems, despite repeated representations to investors to the contrary.

87.     Additionally, Rink was aware that the majority of real estate sales made by Mantria were either financed by Mantria Financial with investor funds and purchased from Mantria Operational Group.  Therefore, Rink knew that Mantria was simply moving investor funds from one Mantria subsidiary to another without ever really generating any revenue.

88.     Granoff, as auditor and controller, assisted Rink in the preparation of Mantria's financial statements and therefore knew that Mantria was not earning any profit, but simply moving investor funds from one subsidiary to another.

89.     Likewise, Krassenstein prepared Mantria's financial statements for the Private Placement Memorandums, and would regularly meet with Rink to prepare for and create those financial statements.

90.     Nevertheless, in preparing financial statements to include in securities offerings, Granoff misrepresented Mantria as a profitable business, earning monies from the sale of biochar and real estate.

91.     Mantria's securities violations, and the resulting SEC Action and Judgment, were proximately caused by the Accounting Defendants' breach of their duty of care and either their sanction of, or reckless disregard of, evidence of accounting discrepancies, a lack of internal controls, improper disclosures and claims in the offering documents and other investor material,

and other securities violations for which Mantria now has entered against it a $39 million judgment.

### FIRST CLAIM FOR RELIEF
(Legal Malpractice Against the Attorney Defendants)

92.     The Receiver realleges and incorporates the allegations contained in paragraphs 1-91.

93.     Astor Weiss was counsel to Mantria from August 2007 through June 2009. During that period of time they were paid in excess $200,000.00 in fees for their representation of Mantria.

94.     Flannery was counsel to Mantria from August 2007 through January 2010.

95.     As attorneys for Mantria, the Attorney Defendants owed Mantria, their client, a duty to exercise a reasonable degree of care and skill in their representation of Mantria.

96.     The Attorney Defendants did not render their legal services in accordance with acceptable standards of care in the community, and the Attorney Defendants therefore breached their duty of care.

97.     The Attorney Defendants breached their duty to exercise reasonable care and skill in their representation of Mantria because they:  (1) failed to reasonably and properly advise Mantria on the securities laws and regulations relating to the Mantria offerings; (2) failed to reasonably and properly investigate the Mantria offerings before approving and preparing the offerings; (3) negligently prepared and approved the Mantria investment offerings, which violated the securities laws and regulations; (4) failed to properly administer and manage attorney trust accounts in connection with the Mantria offerings; (5) failed to reasonably investigate and provide appropriate advice to Mantria concerning payments made to Wayde

McKelvy in connection with the offerings; (6) failed to reasonably and appropriately investigate and provide advice on the use of funds generated in connection with the offerings; and (7) failed to put in place adequate insurance policies.

98.     As a direct and proximate cause of the Attorney Defendants' breach of the duty of reasonable care and skill, Mantria suffered damages in excess of $39 million.

99.     Additionally, the fees paid to the Attorney Defendants for periods in which they were in breach of their duty of reasonable care and skill should be disgorged.

## SECOND CLAIM FOR RELIEF
(Breach of Fiduciary Duty Against the Attorney Defendants)

100.    The Receiver realleges and incorporates the allegations contained in paragraphs 1-99.

101.    As attorneys for Mantria, the Attorney Defendants owed Mantria, their client, a fiduciary duty of due care and loyalty, including the duty to put Mantria's interests ahead of any principals' personal interests or the interests of any third party.

102.    The Attorney Defendants did not render their legal services in accordance with acceptable standards of care in the community, and the Attorney Defendants therefore breached their fiduciary duties and duty of care.

103.    The Attorney Defendants breached their fiduciary duties to Mantria because they: (1) failed to reasonably and properly advise Mantria on the securities laws and regulations relating to the Mantria offerings; (2) failed to reasonably and properly investigate the Mantria offerings before approving and preparing the offerings; (3) negligently prepared and approved the Mantria investment offerings, which violated the securities laws and regulations; (4) failed to properly administer and manage attorney trust accounts in connection with the Mantria offerings;

(5) failed to reasonably investigate and provide appropriate advice to Mantria concerning payments made to Wayde McKelvy in connection with the offerings; (6) failed to reasonably and appropriately investigate and provide advice on the use of funds generated in connection with the offerings; and (7) failed to put in place adequate insurance policies.

104.    As a direct and proximate cause of the Attorney Defendants' breach of their fiduciary duty of care and loyalty, Mantria suffered damages in excess of $39 million.

105.    Additionally, the fees paid to the Attorney Defendants for periods in which they were in breach of their fiduciary duty should be disgorged.

**THIRD CLAIM FOR RELIEF**
(Negligence – Against the Accounting Defendants)

106.    The Receiver realleges and incorporates the allegations contained in paragraphs 1-91.

107.    Tatum provided services to Mantria from July 2007 through November 2009. During that period of time, it was paid in excess of $300,000.00 in fees for its services.

108.    Rink served as Mantria's Chief Financial Officer from July 2007 through November 2009 and received in excess of $300,000.00 in wages during that time.

109.    Krassenstein provided services to Mantria from June 2007 through June 2009. During that period of time, it was paid in excess of $11,000.00 in fees for its services.

110.    Granoff provided services to Mantria from October 2007 through November 2009.

111.    Accountants owe a duty of care to their clients to render services with a degree of skill and knowledge normally possessed by members of the accounting profession.

112.    The Accounting Defendants' services to Mantria were not rendered with the degree of skill and knowledge normally possessed by members of the accounting profession and the Accounting Defendants therefore breached their duties to Mantria.  Among other things, they:  (1) failed to reasonably and properly advise Mantria on laws and regulations relating to the Mantria offerings; (2) failed to reasonably and properly investigate the Mantria offerings before approving and preparing the offerings; (3) negligently prepared and approved the Mantria investment offerings that violated the securities laws and regulations; (4) failed to properly implement internal controls; (5) failed to properly and regularly generate appropriate financial statements and related documents; (6) failed to reasonably investigate and provide appropriate advice to Mantria concerning payments made to Wayde McKelvy in connection with the offerings; (7) failed to reasonably and appropriately investigate and provide advice on the use of funds generated in connection with the offerings; and (8) failed to put in place adequate insurance policies.

113.    The Accounting Defendants' services to Mantria were not rendered in accordance with accepted professional standards and the Accounting Defendants therefore breached their duties to Mantria.

114.    The Accounting Defendants' actions that negligently, carelessly, and/or recklessly violated their obligations to Mantria caused substantial damages and irreparable harm to Mantria.

115.    The Accounting Defendants' actions that negligently, carelessly, or recklessly violated their obligations to Mantria were the proximate cause of substantial damages and irreparable harm suffered by Mantria of at least $39 million.

116.    Additionally, the fees paid to the Accounting Defendants for periods in which they were in breach of their fiduciary duty should be disgorged.

### FOURTH CLAIM FOR RELIEF
(Breach of Fiduciary Duty Against Tatum and Rink)

117.    The Receiver realleges and incorporates the allegations contained in paragraphs 1-116.

118.    In their position as CFO for Mantria, Rink and Tatum owed Mantria a fiduciary duty of due care and loyalty, including the duty to put Mantria's interests ahead of any of Mantria's principals' personal interests or the interests of any third party.

119.    Tatum and Rink breached their fiduciary duties to Mantria because they: (1) failed to reasonably and properly advise Mantria on laws and regulations relating to the Mantria offerings; (2) failed to reasonably and properly investigate the Mantria offerings before approving and preparing the offerings; (3) negligently prepared and approved the Mantria investment offerings which violated the securities laws and regulations; (4) failed to properly implement internal controls; (5) failed to properly and regularly generate appropriate financial statements and related documents; (6) failed to reasonably investigate and provide appropriate advice to Mantria concerning payments made to Wayde McKelvy in connection with the offerings; (7) failed to reasonably and appropriately investigate and provide advice on the use of funds generated in connection with the offerings; and (8) failed to put in place adequate insurance policies.

120.    As a direct and proximate cause of Rink's and Tatum's breach of the fiduciary duty of care and loyalty, Mantria suffered damages in excess of $39 million.

121.    Additionally, the fees and wages paid to Rink and Tatum for periods in which they were in breach of their fiduciary duty should be disgorged.

## SIXTH CLAIM FOR RELIEF
(Aiding and Abetting Breach of a Fiduciary Duty – Against All Defendants)

122.    The Receiver realleges and incorporates the allegations contained in paragraphs 1-121.

123.    As Mantria's Attorneys, Auditors, and/or Accountants, Defendants knew that the principals of Mantria – Troy Wragg and Amanda Knorr – owed Mantria a fiduciary duty.

124.    Defendants also knew that the principals of Mantria were in breach of their fiduciary duties.

125.    Defendants knowingly provided substantial assistance and encouragement to the Mantria's principals in their breaches of their fiduciary duties.

126.    Defendants therefore aided and abetted Mantria's principals' breaches of their fiduciary duties.  As a result, Defendants are jointly responsible with Mantria's principals for the damages resulting from those breaches.

## FIFTH CLAIM FOR RELIEF
(Breach of Contract Against Astor Weiss, Tatum, and Krassenstein)

127.    The Receiver realleges and incorporates the allegations contained in paragraphs 1-91.

128.    Astor Weiss, Tatum, and Krassenstein were engaged by Mantria to perform certain accounting and legal services.

129.    The engagements constituted valid and binding contracts between Mantria and Astor Weiss, Tatum, and Krassenstein, respectively.

130.    Astor Weiss, Tatum, and Krassenstein failed to abide by the terms of the engagements by failing to perform their duties consistent with the engagements.

131.    As a direct and proximate result of Defendants' breach, Mantria suffered injury to its business and property, including sustaining the judgment in the SEC Action.

### SEVENTH CLAIM FOR RELIEF
(Unjust Enrichment – Against All Defendants)

132.    The Receiver realleges and incorporates the allegations contained in paragraphs 1-91.

133.    Defendants received benefits from Mantria in the form of payments.

134.    Defendants voluntarily accepted the payments.

135.    Defendants retained the funds.

136.    Under the circumstances of this case it would be inequitable, and in violation of good conscience and fundamental principles of justice and equity, for Defendants to retain those payments.

137.    Defendants should be required to pay the value of the payments to the Receiver for the benefit of the investors.

### JURY DEMAND

The Receiver demands a trial by jury on all counts for which a jury trial is permitted.

### REQUEST FOR RELIEF

WHEREFORE, the Receiver respectfully demands judgment against Defendants, jointly and severally, for any and all damages suffered by Mantria, plus interest thereon, as well as for

any costs of suit, and fees and costs as may be authorized by law or otherwise, and such other

and further relief as the Court deems just and proper.

Respectfully submitted this 25th day of February, 2012.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

By:      *s/ Peter J. Korneffel, Jr.*
Peter J. Korneffel, Jr., #19836
Kathryn R. DeBord, #37048
Sarah E. April, # 42568
410 Seventeenth Street, Suite 2200
Denver, Colorado 80202
Phone:  303.223.1100
Fax:  303.223. 1111
Email:  pkorneffel@bhfs.com
            kdebord@bhfs.com
            sapril@bhfs.com

*Attorneys for Plaintiff John Paul Anderson*

Plaintiff's Address:

John Paul Anderson, CFA, CPA
Senior Director
Alvarez & Marsal Global Forensic and Dispute Services, LLC
707 Seventeenth Street, Suite 2125
Denver, CO  80202-3324

14065\2\1652502.4